Clerk, please call the next case. 311-167-BF Freight Systems v. Supervisors May it please the Court. Good afternoon, Your Honors. Counsel. My name is Matthew Agnafo. I represent the appellant in this matter, ABF Freight. Your Honors, we have a tragic death case in this matter. Mr. Ox's cause of death was defined to be polypharmacy, the adverse effects of diazepam and oxycodone. Oxycodone was consistent with a lethal level. The coroner ruled the cause of death to be accidental. Now, if I may quote from the commission decision, the medications in the decedent's system at the time of his death were not prescribed or taken at the direction of a physician from whom he was receiving treatment at the time. Your Honors, how is there a causal relationship between the work injury in January 2001 and his death in March 2003 when what caused his death was not prescribed by a treater who was treating Mr. Ox for his work injury? None of the medications in the system were prescribed by anybody? This is exactly what was quoted in the commission decision, Your Honor. What was deemed to be the cause of death was the oxycodone, which it appears he obtained over the Internet when he contacted this Dr. Ibanez in Florida. Was oxycodone ever prescribed by anybody? I'm sure it is, Your Honor. I just want to make the point that it wasn't prescribed by any of the doctors that were treating the work condition. That was fully understood by the arbitrator, the commission, everybody up and down the line, right? That's true, Your Honor. I'm here today because I believe the manifest way that the evidence dictates that the opposite conclusion is clearly apparent. Well, then you had competing medical opinions, right? I mean, the petitioner's physician that he hired, Dr. Borrelli, I think was the name. Is that right? That's correct, Your Honor. He expressed the opinion that even though the medication had not been prescribed, that the course of treatment that he had received from his work-related injury had conditioned his system. He gave other explanations. Is that true? He gave other explanations, but I would put it to you that how can it be that the oxycodone, which was not prescribed as any line of treatment related to the work injury, which was the cause of his death. In fact, we have an accidental drug overdose, which was the cause of his death. I would put it to you that there is no connection to the January 2001 work injury. Well, let's just talk about that for a second. There's no question he suffered a closed head injury and a neck injury. We know that. Is there any dispute that he had no history of any of these problems prior to the work accident? I would say there's no dispute, Your Honor. Then, admittedly, he was referred to a number of doctors who in turn, as I understood it, prescribed a number of potent antipsychotic drugs at high doses, correct? He starts off on track, correct? It appears he starts out on track, although I would note that as early as 2001, September, there's a urine analysis done and he's tested positive for barbiturates and amphetamines, and it's noted that he obtained these drugs over the Internet as well. I did note that. But there's nothing to suggest in the record that he took any medications like this prior to the accident. So he's being prescribed a number of potent drugs by a number of physicians, and then Dr. Borrelli comes forward and says, hey, there was a treatment plan that was really a nightmare in hindsight. He's had all these medications from all these doctors. He's following the consistent approach from the doctors, and I believe Borrelli said, quote, unquote, these medical prescriptions and treatments conditioned his system to break, and then he breaks down. So why are we saying there's no connection between the accident and all the medications that were prescribed in his death? It seems to me, Your Honor, that he was actively seeking out all this treatment. Absolutely, Dr. Borrelli dictated or opined that it was a nightmare, the treatment that he was undergoing. Even just in November of 2001, we've got the NMI finding of Dr. Kramer, and then three subsequent diagnoses, which are all different, just in the month of November 2001. I can briefly run through those if you'd like. We have Dr. Haney, November 16, 2001, post-whiplash syndrome, cervical facet syndrome. Dr. Cullen, November 25, 2001, episodic loss of consciousness, and then November 28, 2001, post-concussion syndrome. So now we've got an NMI finding, early November, he keeps treating, he goes to multiple doctors, keeps getting these different diagnoses, and what he's getting out of this subsequent treatment is basically access to more prescription medication. As pointed out by Commissioner Lambourne in his very poignant dissent, what we have is, you know, we have Mr. Ox basically outsmarting the doctors. Commissioner Lambourne noted the student successfully received prescribed medications, 10 different physicians in a span of 26 months. We're talking about 15 different medications. And nothing in the record demonstrates that any of the physicians were aware of what the other physicians were prescribing. So the left hand didn't know what the right hand was doing, in other words. Nothing in the record, Your Honor. Okay. So the record says there's nothing there. You can infer that there wasn't, right? Well, the record starts with his work injury. Now, you're saying there were other drugs found in his system that were not prescribed. Is that what you're arguing? Not prescribed by any doctor which was treating him as part of his work program. So Dr. Borrelli did opine, however, that the medications in the employee's system at the time of his death would not have caused his death. Would not have caused his death if he had not been on a two-year, as he called it, polypharmacy track as a result of the legitimate treatments he received to relieve the condition. So he starts out on track. He's getting all of these heavy antipsychotic medications prescribed to him. And if he got some things that maybe he wasn't supposed to, does that mean that he doesn't recover? That has to be your argument, correct? Correct. Now, I would say that the treatment was on track only up to a certain extent, Your Honor. It seems like fairly quickly the treatment got off track with Mr. Ox specifically seeking out different doctors and access to different medications apparently through the Internet as early as September 2001. Where did he get the oxycodone that was in his system when he died? That was from the Florida doctor, Dr. Ed Banez. And where did he get the valium? The diazepam? The valium that was in his system. Yeah, that's diazepam. I'm not sure, Your Honor. It could have either been, I know he probably had some left over. The record does indicate that he wasn't prescribed anything within the previous four months to his death. Now, ABS expert, Dr. O'Donnell, confirmed the use of the Internet to obtain medications, continued use of analgesics to treat his pain. Now, Dr. O'Donnell noted these drugs were not part of any post-accident treatment, and therefore the death should not be considered directly related to the accident. In the doctor's opinion, the polypharmacy was created by decedent, not by the medical treatment. As Commissioner Lamborton pointed out, we have two conditions here. We've got the work injury, January 9, 2001, and then a concurrent drug addiction, which ran at the same time as the work injury, and which ultimately was the cause of his death. That drug addiction led to the drug overdose, not the work injury itself, Your Honor. There's nothing here in our opinion that the drug addiction stemmed from the work incident and the treatment thereof. I don't believe there's such an opinion in the record, absolutely, Your Honor. Can't you read Borrelli's opinion as being tantamount to that? Isn't that basically what he said, that all of these various psychotic medications set him on a trap that would have broke down his system? Isn't that sort of what Borrelli said? They set him on a trap, Your Honor. I believe that if each of the doctors that Mr. Ox is treating with would have known what the other doctors were prescribing and the regimen of medication that he was on, that they would have adjusted the medication to be in a proper ratio, or however you want to say it, so that he wouldn't have had such adverse effects. That's exactly what Borrelli said, right? He had nightmare treatment. He was going to 10 different doctors. They were all prescribing large dosage of antipsychotic medication and other medications, and that was the problem. I believe that it was the decedent seeking out that treatment that was the problem. Well, and so we have competing medical opinions. We have different inferences that the Commission could have drawn from the evidence. They could have drawn the inference you just said, but they didn't. That's correct, Your Honor. So how is the Commission's decision against the manifest way to the evidence? How is the opposite conclusion clearly apparent? The cause of death was an accidental drug overdose from Poly Pharmacy. We understand that he was seeking out treatment, seeking out medications which weren't prescribed by doctors which were treating his work condition. The result of seeking out that medication is what caused the overdose. There's a breakdown between the overdose and the line of treatment which was related to the work injury, and I believe that's where the manifest way to the evidence kicks in, where the opposite conclusion should be apparent. You're not arguing this drug overdose was some independent intervening cause, are you? I'm sorry? Are you arguing that this drug, alleged drug overdose, constituted some independent intervening cause? Essentially, and that's what Commissioner Landborg pointed that out, that we have basically two conditions here. We've got the work injury and then a drug, how did he put it, a concurrent drug addiction, which was running contemporaneously while he was treating for the work injury. And, Your Honor, I'd just like to briefly also discuss Doesn't that really think concurrent means it's going along with, what we should be in the business looking at is why did it occur? I would put it to you, Your Honor, that they were distinct, that the drug addiction was a separate condition which Mr. Ox suffered from. As a result of that condition, that's why he died. You're saying there's no evidence in the record he ever took any drugs at all before the accident and it was prescribed for him, right? There's no evidence in the record regarding anything that happened prior to the date of injury. You are correct, Your Honor. Well, the evidence is he was a 31-year-old guy who worked regularly. His wife testified he worked out five days a week. There was no evidence that he ever used drugs before. I mean, you agree with that, don't you? So, I mean, on this record, we have to look at it such that all this started with his work injury. Correct. I mean, whatever, as you put it, concurrent drug addiction he had came after all these doctors started prescribing all this medication for him. It wasn't only the doctors prescribing the medication in Appellant's position, Your Honor. It was the decedent actively seeking. Well, it started. I mean, there's no evidence that he actively sought out any drugs until after the doctors started prescribing all this medication. True? That is correct, Your Honor. Regarding the penalties that were awarded for TTD, Your Honor, we do have the early November report of Dr. Kramer. He indicated that the petitioner was MMI at this time. Now, generally, when an employer acts in reliance upon reasonable medical opinion or when there are conflicting medical opinions, penalties ordinarily are not imposed. This is pursuant to global products case. The test is whether the employer's conduct in relying on the medical opinion to contest liability is reasonable under the circumstances presented. Now, there's nothing in the records to indicate that respondents' ABF's reliance on the report of Dr. Kramer was unreasonable. ABF hired a medical expert. They got an opinion. It was favorable to ABF. And ABF acted in reliance on that opinion to cut off TTD. Now, I certainly understand that the commission weighed this evidence against the subsequent medical opinions and deemed that TTD was proper past early November 2001. But I would certainly dispute the fact that penalties were awarded for this period based on the fact that it was not an arbitrary termination of benefits. It wasn't the fact that we had no position to support the termination of benefits in early November 2001. As I said, we went out, got an opinion, acted in reliance on that opinion, and that's why benefits were terminated. There's nothing unreasonable or vexatious about that. All right, you'll have time on rebuttal. Thank you, Your Honor. Counsel, please. May it please the Court, Counsel? My name is John Castaneda. I'm here on behalf of the widow, Marissa Oaks, regarding this claim. I would like to address the causal connection question which Counsel raised in his argument. In the case of Illinois Power, this Court has indicated that the concern of a court of review in reviewing the Industrial Commission decision is not to determine medical questions of which persons of learning in that field might disagree, but rather the legal question is whether or not the finding of the commission, which was confirmed by the circuit court, is against the manifest weight of the evidence, whether there's any sufficient factual evidence in the record to support the commission's decision. In this case, we have the opinion of Dr. Nelson Borelli, who's a board-certified psychiatrist, on staff at Northwestern University, who stated in his opinion that Mr. Oaks' death was a direct relationship to the 1-9-2001 accident. The polypharmacy diagnosis was consistent with the record of Mr. Oaks' drug treatment starting at the time of his original accident in January of 2001. The day following the accident, Mr. Oaks started treating with various physicians due to his various different medical diagnoses. He did not just have a post-concussion syndrome. He had a cervical injury. He had a back injury. He had depression and anxiety that were related to his subsequent attempt to recover from this injury. And Dr. Borelli indicated that it was his opinion that as a result of the medication that was prescribed for Mr. Oaks, the polypharmacy of the mix of medications he was under increased the risk of bad side effects and also increased the risk of his death. The post-concussion syndrome was accompanied by the diagnosis of depression and anxiety. Now, we look at the two medications that were found in the autopsy report. Dizepam, which is also known as Valium, and Oxycodone, which we know is a narcotic. And we look at Mr. Oaks' treatment with his treating pain management doctor, Dr. Heaney, who testified via evidence deposition. Dr. Heaney testified that he was treating Mr. Oaks with Hydrocodone, which is a pain narcotic, and also with Ativan, A-T-I-V-A-N, which is similar to Valium. He also testified he was treating Mr. Oaks with Percocet, which is otherwise known as Oxycodone. So we have the treating pain management physician prescribing the exact medication that Mr. Oaks was found to have at the time of the autopsy. In response to Dr. Borrelli's opinions given in this case, the respondent retained Dr. O'Donnell to do a records review. Dr. O'Donnell indicated that Mr. Oaks' case is very unusual since millions of patients take these same types of medication and don't overdose. The problem with that analysis is that Mr. Oaks had an acute injury necessitating medication over a long, long course of time, two years in fact. And also that he had a complicating factor in that he was having a psychological condition that was not being managed. In fact, Dr. Kramer, the respondent's examiner, indicated in his opinion that although Mr. Oaks was at MMI neurologically, he needed to be managed psychologically. How do you respond to this? I understand part of the argument that counsel has been emphasizing here this afternoon is that there was also diazepam in the claimant's system, correct? Correct. That was not obtained legally, was it? We don't know. We don't know how it was obtained. The only doctor that he contacted over the Internet, Dr. Ibanez, prescribed hydrocodone, which was similar to what Dr. Heaney was prescribing. We really don't know. The record isn't clear in terms of how exactly he obtained the Valium and the diazepam that he was taking. But those medications were exactly the type that were being prescribed by Dr. Heaney. So Mr. Oaks was aware of the medication being prescribed for him. And in fact, he testified that he thought at times he was over-medicated. But he was just following the treatment prescribed by his doctors. There is nothing in this record to establish the fact that Mr. Oaks, number one, was a drug addict or that he was seeking drugs because he was a drug addict. But isn't his argument, did he not obtain some of these drugs over the Internet? They were not obtained from his treating physicians, were they? The only drug that was obtained over the Internet was the hydrocodone. That was it. And that was from Dr. Ibanez. That was the only medication obtained. He had been prescribed Valium during his treatment, though, in the past. Yes, he was, Your Honor. He was under a prescription by Dr. Heaney because of his depression and anxiety that he was suffering from his injuries. As I mentioned before... Had that treatment been discontinued? Yes, it was. What happened was, after he saw Dr. Kramer and Dr. Kramer put him at MMI, the respondent stopped paying for any further treatment and any further disability. So Mr. Oaks testified that he had to go out and pay out-of-pocket many of the medications that he was undergoing at that time. Despite the fact that Dr. Kramer indicated in his opinion that he was only at MMI neurologically. He still thought that Mr. Oaks should have a psychological consultation, which he was able to do with Dr. Urantha, but was not able to continue because at that point the case was disputed and nothing further was being authorized. Mr. Oaks testified that he was unable to get medication through the workers' compensation carrier, and so what happened here is Mr. Oaks is having to self-medicate without any authorization, without any further care or treatment being provided. He's having and being forced to self-medicate. He's aware of the medications he was prescribed earlier, and the record appears to show that he attempted to do self-medication after his treatment was no longer authorized. Dr. Borrelli indicated that the polypharmacy track that he was on increased the risk of bad side effects and increased the risk of death. Dr. Borrelli also indicated that for two years he was on this polypharmacy track, and so what unfortunately happened in this case is Mr. Oaks accidentally overdosed in taking these medications which were prescribed by him earlier. With regard to the penalties issue that was raised by counsel, the rules require that the employer, once beginning payment, shall provide the employee with a written explanation of the basis for termination or suspension of further benefits no later than the date of the last payment. There's nothing in this record to show that the respondent or the insurance carer ever sent written notification to Mr. Oaks that his benefits were being terminated or the basis of why they were being terminated. In fact, the nurse case manager that was involved in the case was the one who told Mr. Oaks he was no longer going to get paid and that he should return to work per the instructions of Dr. Cramer. Thus, the employer in this case failed to provide any basis in notifying Mr. Oaks per the rules why his benefits were terminated, and I think it was that basis along with the fact that several other physicians after Dr. Cramer indicated in their opinions that he could not return to work. That was the basis for which the commission awarded penalties and fees as a result of the respondent's termination. I ask the court to affirm the decision of the commission and the circuit court in this case. I refer the court to my brief for argument on the TTD issues and the average weekly wage and the 19D. Are there any questions? Thank you, counsel. Thank you, Your Honors. Briefly, I'd like to discuss the internet medications. On page 9 of Apelli's brief to this court, it is mentioned the positive urine test for barbiturates and amphetamines, which Mr. Oaks admitted were a result of internet medications. That's on page 9 of their brief. I would agree with the self-medication that counsel presented to you, his hypothesis about this case. Unfortunately, it's self-medication that went tragically wrong in this case, ended up in the drug overdose, and again, our position is strong that this drug overdose, not related to a work injury, was a result of a drug overdose that occurred two years later. And regarding penalties, I mean, I can't say for certain, but I believe that Dr. Kramer's report would have been forwarded to counsel, probably with documentation that no further TTD benefits would be forthcoming based on that report. If there's no further questions, I'll conclude. Thank you, counsel.